IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

     Plaintiff,        No.  03:12-cr-00373-HZ-2

  v.

SAMUEL NAVARRETTE-AGUILAR, and    OPINION & ORDER
SAUL GUZMAN-ARIAS

     Defendants.


S. Amanda Marshall
UNITED STATES ATTORNEY
District of Oregon
Kathleen L. Bickers
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Ave., Suite 600
Portland, Oregon 97204-2902

   Attorney for the United States of America

/ / /

/ / /


1 - OPINION & ORDER

Robert B. Hamilton
PACIFIC NORTHWEST LAW, LLP
1420 World Trade Center
121 S.W. Salmon Street
Portland, Oregon 97204

     Attorney for Defendant Guzman-Arias

HERNANDEZ, District Judge:

     On June 7, 2013, a jury found Defendants Samuel Navarrette-Aguilar and Saul Guzman-Arias guilty of three crimes: (1) conspiring to distribute heroin in violation of 21 U.S.C. §§ 841, 846, (2) distribution of heroin in violation of 21 U.S.C. § 841, and (3) possession with intent to distribute heroin in violation of 21 U.S.C. § 841. As part of the verdict, the jury answered separate questions relating to the quantity of heroin and whether the distribution of the heroin resulted in the death of another person. The jury found beyond a reasonable doubt that the total quantity of heroin agreed to be distributed by each Defendant and any other member of the conspiracy weighed at least one kilogram, that the heroin possessed by each Defendant with the intent to distribute it weighed at least one hundred grams, but that the use of the heroin distributed by the conspiracy, or by each Defendant, did not result in the death of another person.

     Defendant Guzman-Arias moves for judgment of acquittal and a new trial. He does not contest participating in a drug distribution conspiracy but he attacks the one kilogram quantity finding. He argues that there was insufficient evidence to support that amount and that the Government inappropriately relied on future distributions by the conspiracy in arriving at the one kilogram weight.

     I deny the motions because a reasonable juror could conclude that the conspiracy agreed to distribute at least one kilogram of heroin.

2 - OPINION & ORDER

I. Motion for Judgment of Acquittal

    A. Standards

Federal Rule of Criminal Procedure 29 provides that a court, on the motion of a

defendant, must enter a judgment of acquittal as to any offense for which the evidence is

insufficient to sustain a conviction.  A defendant may "move for a judgment of acquittal . . .

within 14 days after a guilty verdict[.]"  Fed. R. Crim. P. 29(c)(1).  No prior motion is required.

Fed. R. Crim. P. 29(c)(3).

In assessing the sufficiency of the evidence, the court must determine "whether 'after

viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt.'"  United States

v. Nevils, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc) (quoting Jackson v. Virginia, 443

U.S. 307, 319 (1979)) (emphasis in Jackson).  The "court must consider the evidence presented at

trial in the light most favorable to the prosecution" and if "'faced with a record of historical facts

that supports conflicting inferences' a reviewing court 'must presume-even if it does not

affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the

prosecution, and must defer to that resolution.'"  Id. at 1164 (quoting Jackson, 443 U.S. at 326).

"[A]fter viewing the evidence in the light most favorable to the prosecution," the court

"must determine whether this evidence, so viewed, is adequate to allow 'any rational trier of fact

to find the essential elements of the crime beyond a reasonable doubt.'"  Id. (quoting Jackson, 443

U.S. at 319) (brackets omitted, emphasis in Jackson).  "This second step protects against rare

occasions in which 'a properly instructed jury may convict even when it can be said that no

rational trier of fact could find guilt beyond a reasonable doubt.'"  Id. (quoting Jackson, 443 U.S.

at 317) (brackets and ellipsis omitted).  Thus, for example, "evidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case."  Id. at 1167.

B.  Discussion

Defendant Guzman-Arias concedes that the Government established that the conspiracy distributed the following specific quantities of heroin:  (1)  199 grams found in Defendant Guzman-Arias's car on June 8, 2012 when he was arrested as a result of a deal set up through cooperating Defendant Antonio Equihua-Ramirez; (2) 62 grams found in Defendant Equihua-Ramirez's car on June 6, 2012 when he was arrested as a result of a deal set up through his customer Josef Burns; and (3) 13 grams found in Defendant Equihua-Ramirez's home pursuant to a consent search on June 6, 2012.  The total of these amounts is 274 grams.

Defendant Guzman-Arias argues that the testimony from Defendant Equihua-Ramirez and Burns was too speculative to allow any rational trier of fact to conclude that the conspiracy agreed to distribute one kilogram of heroin.  Defendant Guzman-Arias further argues that it was error for the Government to argue that in determining whether the one kilogram threshold was met, the jury "could speculate that if the defendants made an agreement to distribute heroin, then they effectively agreed to distribute more than one kilogram of heroin because if they had not been caught they would have kept on dealing."  Def.'s Mot. for J. of Acq. at 3.

1.  Equihua-Ramirez's Testimony

Defendant Equihua-Ramirez testified that he met Defendant Guzman-Arias, whom he knew as Pariente, in March 2012 through "Carlos" who was leaving the area and turned his customers over to Defendant Equihua-Ramirez.  Carlos gave Defendant Equihua-Ramirez a

California phone number which belonged to a man Defendant Equihua-Ramirez called "Califas" and who was later identified as Defendant Navarrete-Aguilar. The distribution network operated by Defendant Equihua-Ramirez placing an order with Defendant Navarrete-Aguilar/Califas, whom he believed was in California but who was actually in Oregon. Defendant Navarrete-Aguilar/Califas would then connect Defendant Equihua-Ramirez with Defendant Guzman-Arias, the person Defendant Equihua-Ramirez actually conducted business with in person. Thus, Defendant Equihua-Ramirez obtained the drugs from Defendant Guzman-Arias via orders from Defendant Navarrete-Aguilar/Califas, and he would pay money to Defendant Guzman-Arias.

Defendant Equihua-Ramirez's first transaction with Defendant Guzman-Arias was in March 2012. Defendant Equihua-Ramirez testified he obtained drugs from Defendant Guzman-Arias about thirteen or fourteen times. Defendant Guzman-Arias would front the drugs to Defendant Equihua-Ramirez who was expected to pay Defendant Guzman-Arias after the sales. Defendant Equihua-Ramirez initially bought one ounce and the most he ever bought was four ounces. Conceding that he did not remember very well, he thought that the last time he bought four ounces was shortly before he was caught and arrested. When he was arrested, Defendant Equihua-Ramirez had approximately $7,800 in cash from completed drug sales that he intended to turn over to Defendant Guzman-Arias.

Burns, as part of the deal orchestrated by the police, ordered heroin from Defendant Equihua-Ramirez who in turn ordered "eight"[1] from Defendant Navarrete-Aguilar/Califas which Defendant Equihua-Ramirez intended to pick up from Defendant Guzman-Arias. Defendant

---

[1] The trial testimony established that the references to numbers such as one, two, three, four, or eight were to "pieces" or "ounces" with a single piece or ounce considered to be twenty-five grams.

5 - OPINION & ORDER

Equihua-Ramirez stated this was a larger amount than he had bought in the past.

Defendant Equihua-Ramirez testified that he had other customers besides Burns but they were small "gram" customers, meaning they purchased amounts in rather small gram quantities rather than pieces or ounces. On cross-examination, he testified that including Burns, he was selling to six people. He repeated that other than Burns, the others were "small time." Tr. 63.[2]

On cross-examination by Defendant Guzman-Arias, Defendant Equihua-Ramirez testified that he recalled telling Portland Police Officer Tim Manzella that he had met Defendant Guzman-Arias about ten times, or between ten and thirteen times. But, he added that he "does" not remember very well. He confirmed that there were about 120 calls between himself and Defendant Navarrette-Aguilar/Califas but explained that more than one call was needed to set up a deal.

Defendant Equihua-Ramirez indicated in further cross-examination that he sold two, sometimes three, pieces to Burns each week. The last time he sold to Burns was about a week before he was arrested on June 6, 2012. He then described selling "like two" to Burns about two times a month. He said when Burns first bought from him, Burns was buying one ounce at a time and then sometimes it was one ounce and sometimes two. After starting with the one ounce purchases, Burns would sometimes request two or three pieces. Defendant Equihua-Ramirez denied having said that he sold three pieces to Burns only one time, because sometimes, he took two, sometimes three. Tr. 72-73. But, in response to the next question, he then said that Burns bought three pieces on only one occasion and that the other times, he would buy only one or two pieces, depending on how good the heroin was. Id.

---

[2] Ex. 2 to Hamilton Aug. 1, 2013 Decl.

6 - OPINION & ORDER

Defendant Guzman-Arias argues that Defendant Equihua-Ramirez's testimony about quantities he sold to Burns and others or quantities he purchased from Defendant Guzman-Arias through phone calls to Defendant Navarrette-Aguilar/Califas is so equivocal, unspecific, and vague that no rational jury could with any reasonable certainty find beyond a reasonable doubt that the conspiracy agreed to distribute one kilogram of heroin.

Examining Defendant Equihua-Ramirez's testimony in a light most favorable to the prosecution and drawing all inferences in the Government's favor, it is fair to credit the number of purchases he made from Defendant Guzman-Arias as fourteen rather than ten. The record is unclear whether the eight pieces Defendant Equihua-Ramirez ordered from Defendant Navarrette-Aguilar/Califas as part of the sting to arrest Defendant Guzman-Arias was one of the fourteen purchases. However, again construing the evidence in favor of the prosecution and drawing inferences in the Government's favor, a rational juror could reasonably infer that given that Defendant Equihua-Ramirez never actually completed that purchase due to Defendant Guzman-Arias's arrest, the transaction for the eight pieces was not included as one of the fourteen purchases he made with Defendant Guzman-Arias.

The problem for the Government is that after establishing that Defendant Equihua-Ramirez made fourteen purchases from Defendant Guzman-Arias, the Government did not elicit from Defendant Equihua-Ramirez testimony regarding the total amount of heroin he purchased over the course of his relationship with Defendant Guzman-Arias. There is fairly straightforward testimony that the last purchase Defendant Equihua-Ramirez made before his own arrest was for four pieces, or 100 grams. Other than that, the testimony is only that he started out buying one or perhaps two pieces at a time and worked up to buying four pieces. As Defendant Guzman-Arias

notes, Defendant Equihua-Ramirez did not testify as to how many times he bought one piece versus two pieces versus four pieces.

As noted above, the record establishes that 274 grams is attributable to Defendant Equihua-Ramirez's purchases from Defendant Guzman-Arias. The last of the fourteen purchases he made before his arrest was for four ounces, or 100 grams, making the total 374 grams. That leaves thirteen purchases of anywhere from one to four ounces per purchase. Given the testimony, to reach the one kilogram figure, the jury could only speculate as to how many times out of those thirteen purchases Defendant Equihua-Ramirez bought one, two, three, or four pieces. While the jury knew that Defendant Equihua-Ramirez purchased smaller amounts when he first began his relationship with Defendants and that one last purchase was for four ounces, nothing in his testimony allowed the jury to reasonably conclude that the first x or y purchases were for one ounce, the next x or y were for two or three ounces, and the last x or y were for four ounces. Without any evidence suggesting a pattern or frequency of amounts, the testimony allowed the jury only to guess at the total amount purchased from the beginning of the relationship until Defendant Equihua-Ramirez's arrest.

Officer Manzella's testimony does not render the amount attributable to these purchases any less speculative. Officer Manzella testified that Defendant Equihua-Ramirez told him that the cash he was arrested with was intended to pay for six pieces he had been fronted by Defendant Navarrette-Aguilar/Califas through Defendant Guzman-Arias the prior week. Six pieces equals 150 grams. But, the record does not show how many of the thirteen purchases this might represent. It could be three, two-piece purchases, leaving only ten remaining transactions; it could be two, three-piece purchases, leaving eleven transactions; it could be six separate

8 - OPINION & ORDER

purchases, leaving seven transactions.  Noting in the record indicates how frequently Defendant

Equihuas-Ramirez actually paid the money he obtained from his sales to Defendant Guzman-

Arias.  The jury would have had to guess to calculate the total amount based on this testimony.

Officer Manzella's testimony also confirmed that Defendant Equihua-Ramirez placed at least ten

orders with Defendant Navarrette-Aguilar/Califas over the course of their relationship and that

the last order placed before his arrest was for four pieces.  Officer Manzella's testimony about the

relationship between Defendant Equihua-Ramirez and the other Defendants does not provide any

specific quantity testimony helpful to the Government.

   When considered in a light most favorable to the Government, Defendant Equihua-

Ramirez's testimony and Officer Manzella's testimony regarding what Defendant Equihua-

Ramirez reported to him during his investigation, established without speculation that Defendant

Equihua-Ramirez made fourteen purchases of heroin from Defendant Guzman-Arias via calls to

Defendant Navarrette-Aguilar/Califas over an approximate ten-week period from mid-March to

early June 2012.  It also established that the final purchase before Defendant Equihua-Ramirez's

arrest was for four ounces, or 100 grams.  However, the testimony fails to establish beyond a

reasonable doubt that the amount actually distributed was at least one kilogram.[3]

   Defendant Equihua-Ramirez's testimony about what he sold to Burns and others is even

---

[3] Based on Defendant Equihua-Ramirez's testimony alone, the jury could have, without
speculation, relied on the most conservative estimate and determined that 699 grams of heroin
was involved. This is achieved by taking the 274 grams Defendant Guzman-Arias admitted,
adding 100 grams from the last four-ounce transaction Defendant Equihua-Ramirez had with
Defendant Guzman-Arias before Defendant Equihua-Ramirez's arrest, and adding an additional
325 grams based on an assumption that the remaining thirteen transactions were for one ounce
each, the minimum amount Defendant Equihua-Ramirez conceded he purchased from Defendant
Guzman-Arias at each transaction.

9 - OPINION & ORDER

less reliable or informative than his testimony regarding his purchases from the other Defendants. While a jury could in theory rely on what Defendant Equihua-Ramirez sold as opposed to what he bought as a way of establishing the total amount of heroin involved in the conspiracy, Defendant Equihua-Ramirez's testimony regarding his sales was all over the map. Burns was Defendant Equihua-Ramirez's best customer. His last sale to Burns, before the buy and bust arranged by Burns in which Defendant Equihua-Ramirez was arrested, was for two ounces, or fifty grams in late May 2012. Defendant Equihua-Ramirez's testimony indicates that when Burns first started purchasing heroin from Defendant Equihua-Ramirez, Burns bought one ounce at a time, and then after that, sometimes it was one ounce and sometimes two. The testimony was unclear as to whether Burns purchased three ounces only once or more frequently than that. Thus, construing the evidence in a light most favorable to the government, Burns purchased in one or two ounce quantities and at least once, but perhaps a few times, purchased three ounces in a single transaction.

In addition to the inconsistent testimony about quantity sold to Burns, the testimony about frequency is similarly confusing. Defendant Equihua-Ramirez said that he sold heroin to Burns and others "two times a week, once a week. It depended." Tr. 64. As to Burns in particular, he testified that it was sometimes two pieces and sometimes three pieces "a week," Tr. 76, and that after he first met him in March, he did deals with him "two times a month" when "[h]e would get like two" ounces. Tr. 79.

Finally, Defendant Equihua-Ramirez's testimony about Burns and his customer Licenciado failing to buy from him after he sold them some bad heroin is hard to follow. He indicated that he started selling to Burns in March 2012 and that as a result of the bad drugs he

had sold, he was selling only once a month which he indicated was "around" April.  Tr. 72.  But, he also stated that the sale of bad drugs to Burns was the sale he made in late May 2012.  Tr. 85. Then upon further questioning he indicated that there had been more than one batch of bad drugs. Id.  He also indicated that Burns and others stopped buying for about two weeks, but then he indicated that they resumed buying the first of April, or maybe the first of May "more or less." Tr. 73-74.  It is reasonable for the jury to conclude that Defendant Equihua-Ramirez gave Burns one ounce to try after the bad drugs in an effort to reestablish the transactional relationship, but when that occurred is unclear.

Defendant Equihua-Ramirez's testimony about his sales could not allow a rational juror to reasonably conclude that he sold one kilogram or more of heroin while a member of the conspiracy.  The testimony is all over the place regarding both quantity and frequency of sales and it is only by speculating that a rational juror could conclude that the amount distributed was at least one kilogram.

And, as with the testimony about purchases, Officer Manzella's testimony as to what Defendant Equihua-Ramirez previously told him about his sales is also insufficient to establish the quantity because it only corroborates the specific testimony already given by Defendant Equihua-Ramirez.  For example, Officer Manzella testified that Defendant Equihua-Ramirez told him that Burns was his biggest customer and that he had a few other gram-level customers, that Burns bought in pieces and started with one piece, then progressed to two pieces, and one time bought three pieces.  This testimony does not assist the Government in establishing, based on Defendant Equihua-Ramirez's sales, that the conspiracy distributed one kilogram of heroin.

/ / /

11 - OPINION & ORDER

2.  Josef Burns's Testimony

Burns testified that he purchased heroin from Defendant Equihua-Ramirez fifty or sixty times over a period of a few months.  Tr. 10.[4]  Burns later clarified that he had known Defendant Equihua-Ramirez for a little over two months at the time of his arrest and agreed that the fifty or sixty purchases he previously referred to was "absurd" and that it had actually been about sixteen times.  Tr. 44-45.  He explained that there were fifty to sixty phone calls because sometimes three to five calls were made for just one deal.  Tr. 45.  When asked if twelve to sixteen times was closer to the number of times he actually met with Defendant Equihua-Ramirez, Burns responded:  "Sure.  I mean, yeah.  You know, I mean, whatever.  I mean, I'm not sure.  I can't say exactly."  Tr. 45.  He also was unable to testify with certainty when his relationship with Defendant Equihua-Ramirez began, stating that it was "March, April, something like that.  April, May, June, yeah, something around there."  Tr. 46.

Burns testified that he purchased one piece at a time initially then worked up to two or three pieces at a time.  He could not estimate the total amount he purchased.  He stated that he had bought two or three pieces at a time for the past month or two regularly, "like every week."  Tr. 12.  He again referred to obtaining a few pieces every week.  However, later he said that he was buying a few pieces at a time, a couple of times per week, and then clarified that he meant "one piece one day and a couple pieces one day" and "[i]t would just depend."  Tr. 27.  He stated that he did not purchase heroin every day, only every few days and that he might only buy one piece in a couple of days because "it was different all the time."  Tr. 27-28.  But, he then said that he would meet his source three or four times a week, but again said sometimes only twice

---

[4]  Ex. 1 to Hamilton Aug. 1, 2013 Decl.

because "[i]t just depends, I guess, what's going on." Tr. 30.  He confirmed that he started by buying only one piece at a time.

Defendant Guzman-Arias argues that Burns's testimony cannot establish the one kilogram amount for two reasons.  First, it was "blatant perjury" because it was contradicted by objective phone records, and second, even accepting the testimony at face value, the jury could find that the conspiracy distributed one kilogram of heroin only by speculating.

Phone records of the phone Defendant Equihua-Ramirez used to contact Burns are found in Defendant Guzman-Arias's Exhibit 202.  Portland Police Bureau Analyst Scott Partridge used the phone records to create charts documenting the number of calls between various phones. Government Exhibit 17 shows a total of sixty-one calls between Defendant Equihua-Ramirez and Burns between April 30, 2012 and June 6, 2012.  Defendant Guzman-Arias argues that based on Burns's testimony that it took several phone calls to set up each deal, the raw number of calls is not relevant; rather, the dates and times of the calls must be examined.  When doing so, Defendant Guzman-Arias argues that the phone records show only four transactions between Defendant Equihua-Ramirez and Burns, which Defendant Guzman-Arias contends is a "far cry" from Burns's estimate of transactions occurring one to three times per week.

Burns testified that it "could" take three to five calls.  He gave no precise figure.  He also gave no testimony explaining any pattern to the calls.  The phone records show forty-eight contacts excluding the thirteen calls associated with the buy and bust of Defendant Equihua-Ramirez by Burns on June 6, 2012.  They are at various times on the following dates:

May 2, 2012:  2 contacts

May 7, 2012:  1 contact

13 - OPINION & ORDER

May 9, 2012:  1 contact

May 10, 2012:  3 contacts

May 12, 2012:  2 contacts

May 14, 2012:  5 contacts

May 16, 2012:  2 contacts

May 17, 2012:  2 contacts

May 21, 2012:  5 contacts

May 24, 2012:  2 contacts

May 25, 2012:  3 contacts

May 26, 2012:  4 contacts

May 27, 2012:  3 contacts

May 30, 2013:  6 contacts

June 2, 2012:  1 contact

June 3, 2012:  2 contacts

June 4, 2012:  2 contacts

June 5, 2012:  2 contacts

Def. Guzman-Arias Ex. 202.

Without explanation, Defendant Guzman-Arias argues that the phone records substantiate a purchase by Burns from Defendant Equihua-Ramirez only on May 10, May 14, May 21, and May 30, 2012.  Defendant Guzman-Arias fails to address why dates with only two contacts do not evidence deals when they occur on back-to-back days such as May 16 and May 17, 2012.  He also fails to address the twelve contacts of May 24-27, 2012, which, when construing the

14 - OPINION & ORDER

evidence in a light most favorable to the government and assuming three contacts per deal,

equals four separate purchases.  He further fails to address the seven contacts occurring over the

four days from June 2-5, 2012, which again, when construing the evidence in a light most

favorable to the government, could equal at least two purchases based on an assumption of three

contacts per deal.  A close examination of the record shows that over the thirty-seven days from

April 30, 2012 through June 5, 2012, or a period of just over five weeks, there were, based on the

assumption that Burns and Defendant Equihua-Ramirez averaged about three contacts per

purchase, sixteen transactions based on the total of forty-eight calls during that time, and when

examining the actual dates of the calls, at least eleven or twelve transactions.[5]  Eleven

transactions over five weeks equals 2.2 transactions per week.  This is consistent with Defendant

Guzman-Arias's position that Burns testified to a one to three times per week frequency of his

deals with Defendant Equihua-Ramirez.  Thus, the phone records are not inconsistent with

Burns's testimony.

　　　　Alternatively, Defendant Guzman-Arias argues that even accepting Burns's testimony, the

jury was still required to speculate to reach the one kilogram amount.  Without explanation,

Defendant Guzman-Arias contends that a rational juror could conclude that there were no more

than twenty meetings between Defendant Equihua-Ramirez and Burns.  I disagree.  As indicated

above, a rational juror could easily conclude that during five weeks, Defendant Equihua-Ramirez

---

[5]  I calculated the following:  (1)  three contacts on May 10, 2012 as one transaction; (2) five contacts on May 14, 2012 as one transaction; (3) four contacts on May 16-17 as one transaction; (4) five contacts on May 21, 2012 as one transaction; (5) twelve contacts on May 24-27 as four transactions; (6) six contacts on May 30, 2012 as one transaction; and (7) seven contacts on June 2-5, 2012 as two or three transactions.  This calculation is enormously favorable to Defendant Guzman-Arias.

and Burns met an average of 2.2 times per week.  Burns testified that he had been conducting

business with Defendant Equihua-Ramirez for a few months, then indicated that it was a little

over two months.  A rational juror could accept Burns's testimony and other evidence in the

record to conclude that Burns and Defendant Equihua-Ramirez had been conducting business

since approximately mid-March 2012, a period of approximately ten weeks before Defendant

Equihua-Ramirez's June 6, 2012 arrest.  A reasonable juror could conclude based on the 2.2

times per week established by the phone records, that over the period of ten weeks, there were at

least twenty-two meetings.

Defendant Guzman-Arias makes a strong argument nonetheless, that like Defendant

Equihua-Ramirez's testimony, Burns's testimony fails to establish the amount of heroin sold at

each of those transactions, leaving the jury to only guess at a total amount.  I agree.  Burns

testified that he started buying one piece at a time and then started buying more.  His testimony

about quantity was inconsistent other than his explanation that each transaction was different and

"it would just depend."  He stated that he bought two or three pieces a time for the "past month or

two," which he then said was "like every week."  He referred to obtaining a "few" pieces every

week.  He later said he purchased a few pieces at a time, a couple of times per week, but then

clarified that it would be one piece one day and a couple of pieces another day.  Arriving at a

total amount of heroin purchased by Burns over the period of ten weeks that Defendant Equihua-

Ramirez was selling to him requires speculation as there is no evidence to support any reasonable

method of estimating the quantity per transaction.  I agree with Defendant Guzman-Arias that

based on Burns's testimony, the jury was left only to speculate as to the total quantity of heroin

distributed.[6]

### 3.  Inferring an Agreement to Distribute One Kilogram

Defendant Guzman-Arias challenges the Government's contention that the one kilogram quantity may be established by evidence that allows the jury to infer an agreement to distribute at least one kilogram of heroin.  He contends that to prove the one kilogram quantity in the context of a conspiracy, the Government must present evidence of an express agreement for the incomplete offenses, or must present actual contraband distributed for the past completed offenses.  I reject this argument.

In support of his position, Defendant Guzman-Arias cites to a 2007 Ninth Circuit case and a 1992 Sixth Circuit referred to by the Ninth Circuit.  In the Ninth Circuit case, the defendant was convicted of conspiracy with intent to distribute fifty grams or more of methamphetamine even though no actual contraband was involved in the commission of the offense.  United States v. Macias-Valencia, 510 F.3d 1012 (9th Cir. 2007).  During a drug investigation by the Drug Enforcement Administration (DEA), the defendant agreed to buy two pounds of methamphetamine from a DEA agent.  The purchase was to occur in two transactions of one pound each.  Agents arrested the defendant after he arrived at the meeting place with cash and contacted the DEA agent to complete the first transaction.  No methamphetamine was present during the investigation or arrest.

---

[6]  The only conclusion the jury could reach without speculation is that Defendant Equihua-Ramirez sold Burns approximately 750 grams of heroin over the course of their relationship.  Burns's testimony rationally supports a conclusion that he purchased a "few" pieces each week.  If a "few" is understood to mean a total of three per week based on the testimony that he would purchase one ounce, then two ounces, the jury could conclude that over the course of the relationship, he purchased approximately thirty ounces (three ounces per week times ten weeks), for a total of 750 grams, still 250 grams shy of one kilogram.

The defendant did not challenge his participation in the conspiracy but argued that the ten-year mandatory minimum sentence for the distribution of that quantity of methamphetamine did not apply because no actual contraband was involved in the commission of the offense. The district court rejected that argument and the defendant appealed.

The Ninth Circuit first noted the "established proposition" that a conspiracy conviction under 21 U.S.C. § 846 "carries with it the same mandatory minimum sentence as a conviction for the corresponding substantive offense under section 841." Id. at 1013 (internal quotation marks omitted). It then noted that a conviction for the substantive offense requires proof that a defendant knowingly possessed a controlled substance and that the defendant had the intention to distribute it. Id. The court explained that from these two propositions, the defendant argued that the mandatory minimum that might otherwise be triggered for an offense under section 846 could not apply to him because there was no methamphetamine for him to possess or distribute. Id. He asserted that the imposition of the mandatory sentence required the involvement of actual contraband. Id.

The court rejected the defendant's argument. It found the texts of sections 841 and 846 clear: "The same penalty that Congress has prescribed for a substantive controlled substance offense applies to any attempt to conspiracy to accomplish that offense. By definition, conspiracy and attempt are inchoate crimes that do not require completion of the criminal objective." Id. at 1014.

After explaining that the legislative history supported its conclusion, the Ninth Circuit then noted that the Sixth Circuit faced a similar situation in United States v. Kottmyer, 961 F.2d 569, 574 (6th Cir. 1992), where the defendant was convicted for a drug distribution conspiracy

18 - OPINION & ORDER

under section 846 even though no actual contraband was involved in the offense.  Id. at 1015.

There, the defendant agreed to buy two kilograms of cocaine from a government agent.  Id.

(citing Kottmyer, 961 F.2d at 571).  The agent, however, had baking soda not cocaine and the

defendant argued that he was not subject to the mandatory minimum because had the transaction

continued and he not been arrested, he would have taken delivery of a legal substance.  Id.  The

Sixth Circuit disagreed and upheld the application of the mandatory minimum because had the

defendant taken delivery of the baking soda, he still would have been guilty of conspiracy and

attempt.  Id. (citing Kottmyer, 961 F.2d at 574).  As the Sixth Circuit noted, "it does not matter

whether the packages . . . contained pure cocaine, pure baking soda, a mixture, or whether they

even existed at all."  Kottmyer, 961 F.2d at 574.

In summarizing its holding in Macias-Valencia, the Ninth Circuit concluded that because

Congress had "dictated that a conviction for a conspiracy to distribute" requires the "same

penalty as a conviction for the distribution of the same amount of the same controlled

substance[,] [n]either a conspiracy conviction nor an attempt conviction requires the delivery,

presence, or even existence of actual contraband."  510 F.3d at 1016.

Defendant Guzman-Arias states that the only express agreement regarding a future,

incomplete, inchoate offense was to sell eight pieces, or 200 grams, to Defendant Equihua-

Ramirez.  He states that the only actual heroin recovered from past completed offenses was the

heroin found in Defendant Equihua-Ramirez's car and home on June 6, 2012.  He argues that

because these past completed transactions are no longer inchoate offenses, but are completed

offenses, actual contraband must exist for such past transactions to count toward the drug

quantity mandatory minimum.  As I understand his argument, because there was an express

agreement for future distribution of only 200 grams, and the past completed transactions amount to only 75 grams, the Government cannot establish the one kilogram amount.

Macias-Valencia and Kottmyer do not support this argument.  In each case, the mandatory minimum sentence applied, even without the actual controlled substance, because there was an express agreement to distribute a specified amount of the controlled substance.  All that was needed for the conspiracy conviction was the agreement to distribute that amount. These two cases do not hold, nor do they even discuss, whether the mandatory minimum sentence may apply to a conspiracy conviction where the agreement to distribute the charged amount of a controlled substance is inferred rather than express.  That issue simply did not arise in either of the cases.  Thus, they offer no support for Defendant Guzman-Arias's contention that the Government had to establish the one kilogram amount of heroin by express agreement to distribute that amount over the course of the conspiracy or by past transactions that when aggregated equal one kilogram.

Two other cases cited by Defendant Guzman-Arias in his Reply Memorandum also provide him with no support because they hold only that in a conspiracy to distribute illegal drugs, the amount of the illicit substance of each past transaction can be aggregated in determining the total amount.  United States v. Pressley, 469 F.3d 63, 66-67 (2d Cir. 2006) (aggregating past transactions admitted to by the defendant that occurred during the course of the conspiracy; noting that "a conspiracy is a single, unified offense" which "involves the aggregate quantity of all the subsidiary transactions attributable to that particular member") (internal quotation marks and brackets omitted); United States v. Gori, 324 F.3d 234, 237 (3d Cir. 2003) (distinguishing between aggregation of multiple transactions for purposes of sentencing for a

substantive offense conviction and for a conspiracy; aggregating eight transactions of methamphetamine in a conspiracy conviction because a conspiracy is a "single violation of the drug laws") (internal quotation marks omitted).  These cases reaffirm that a conspiracy is distinct from the substantive offense and as such, it is appropriate to combine the drug quantities from all transactions to determine the total amount at issue in the conspiracy.  These cases say nothing about whether a jury may infer the quantity of drugs the conspiracy intended to distribute.

A defendant may be exposed to a statutorily enhanced sentence under 21 U.S.C. § 841(b)(1)(A) based on drug quantity in the context of a drug conspiracy charge only if the evidence allows the jury to find beyond a reasonable doubt that the quantity "either (1) fell within the scope of the defendant's agreement with his coconspirators or (2) was reasonably foreseeable to the defendant."  United States v. Banuelos, 322 F.3d 700, 704 (9th Cir. 2003).  In a conspiracy charge, the fact and contours of an agreement may be established by circumstantial evidence. See United States v. Mincoff, 574 F.3d 1186, 1192 (9th Cir. 2009) (circumstantial evidence may prove existence of a conspiracy); United States v. Williams, 547 F.3d 1187, 1196 (9th Cir. 2008) (A "conspiracy may be proven by circumstantial evidence that the defendants acted together with a common goal") (internal quotation marks and brackets omitted); United States v. Vgeri, 51 F.3d 876, 879 (9th Cir. 1995) ("[A]greement may be inferred from the defendants' acts pursuant to the scheme, or other circumstantial evidence") (internal quotation marks omitted). Accordingly, based on the type of evidence allowed to establish a conspiracy, in a drug distribution conspiracy charge the Government may rely on circumstantial evidence and reasonable inferences to establish that the quantity of drugs at issue was reasonably foreseeable to the defendant or fell within the scope of the particular agreement.  None of the cases cited by

Defendant Guzman-Arias holds to the contrary.

Persuasive authority indicates that the factfinder may rely on circumstantial evidence to infer that the members of the conspiracy agreed to distribute a certain quantity of drugs even though the only direct evidence reveals less than that quantity.  For example, in United States v. Arras, 373 F.3d 1071 (10th Cir. 2004), the defendants were charged with conspiracy to import more than 100 kilograms of marijuana.  They challenged the sufficiency of the evidence arguing the government did not prove that the amount of marijuana involved in the conspiracy met the 100 kilogram threshold.  The direct evidence established the conspiracy's importation of thirty-nine kilograms, the amount found with the courier upon her arrest.  But, a customs agent estimated that the courier had transported that quantity in each of four separate trips, not just the one instance in which she was caught.  The court explained that based on various pieces of circumstantial evidence such as the defendant's preoccupation with keeping up the tire pressure in the car (with the tires containing the contraband), his constant reminders to the courier, the fact that the courier was paid or promised the same amount for each trip commensurate with the risk involved, and the fact that the going rate was roughly equal to her payments, a reasonable jury could conclude that the courier was transporting about the same amount of marijuana on each trip and that it was not excessively speculative to conclude that the total amount imported was over 100 kilograms.  Id. at 1076.

In another case, the defendant argued that there was insufficient evidence to sustain his conviction for conspiring to distribute five kilograms of marijuana when direct evidence established the distribution of only 4.5 kilos.  United States v. Turner, 319 F.3d 716  (5th Cir. 2003).  The appellate court affirmed the conviction, explaining that conversations among the co-

defendants about future transactions that did not actually materialize created the inference that the conspiracy involved at least five kilograms.  Id. at 723-24.  Thus, while Arras shows that a jury may reasonably infer an agreement to distribute a certain quantity based on circumstantial evidence of completed conduct, Turner goes a step further because there, the jury reasonably inferred an agreement to distribute a certain quantity based on circumstantial evidence of incomplete, but contemplated, transactions.

The Government's argument in the instant case goes a step further, but that does not mean it is not well-taken.  The Government contends that based on the quantities Defendant Equihua-Ramirez bought or sold during the life of conspiracy, which by conservative estimates based on non-speculative determinations was approximately 699-750 kilograms in just under three months, a rational juror could reasonably infer that Defendants agreed to distribute at least one kilogram of heroin.  Although Defendants' arrests interrupted the ability to actually distribute one kilogram, the evidence allowed the jury to find that Defendants agreed to distribute at least that amount.  Because the agreement is the heart of the criminal conduct in a conspiracy, the fact that some transactions had not yet occurred is irrelevant if the evidence allowed the jury to reasonably conclude beyond a reasonable doubt that Defendants agreed to distribute the charged quantity of heroin.

The facts here distinguish this case from others where the inferences were too speculative or tenuous to support the jury's drug quantity conclusion.  In a Tenth Circuit case, the court reversed the jury's determination that the defendant had agreed to distribute more than five grams of crack cocaine.  United States v. Dunmire, 403 F.3d 722 (10th Cir. 2005).  Detectives set up a controlled buy of five grams of crack cocaine from a target but when the confidential informant

23 - OPINION & ORDER

showed up to make the purchase, the defendant, not the intended target of the investigation, delivered the drugs. Moreover, the defendant delivered only just under three grams instead of five. Only one officer witnessed the transaction and reported that he observed several persons on the front porch of the targeted home and, before the controlled buy was to occur, watched a red car drive up to the home and stop, watched the defendant walk from the porch to the car, stop at the car briefly, then return to the porch. He then observed the controlled buy in which the defendant delivered just under three grams of crack cocaine to the confidential informant.

The only evidence connecting the defendant to the intended target of the investigation was the defendant's presence at the targeted home on the day she participated in the controlled buy and her participation in that deal. Id. at 724. Although there was evidence of the intended target's participation in drug deals for between less than one gram and seven grams of crack cocaine, the defendant had never been seen with the target on any other occasion, the confidential informant had never contacted the defendant to set up a drug purchase, and although the confidential informant had purchased crack cocaine from the target for "some time," he had never seen the defendant before the date she delivered the controlled buy to him. Id. at 725.

The government attempted to meet the five gram quantity in a couple of ways. The government first argued that the jury could have relied on the quantities distributed by the target. The court rejected that theory because without anything more, the defendant's participation in only one drug deal did not demonstrate an implicit agreement to be involved in all of the target's drug deals. Id. at 724 n.2. Citing to its earlier decision in Arras, the court noted that a conviction for conspiracy to distribute a certain quantity of drugs must be supported by evidence of an agreement to distribute that quantity of drugs. Id. (citing Arras, 373 F.3d at 1074). The court

explained that evidence of participation in one drug deal demonstrates an agreement to distribute the amount of drugs involved in that particular transaction but "absent additional evidence, participation in one drug deal does not render one culpable for a conspiracy to distribute the quantity of drugs actually distributed by one's alleged co-conspirator." Id. (further noting that this was "one of those rare cases" where the government failed to present additional evidence permitting an inference regarding an agreement to implicate the defendant's participation in other drug transactions).

Alternatively, the government argued that the officer's observation of the defendant's conduct before the controlled buy when she approached the red car and then returned to the porch allowed the jury to infer an agreement to distribute drugs beyond the amount in the controlled buy. The court rejected this argument because the jury would have had to make repeated speculative inferences to conclude that the defendant distributed just over two grams of crack cocaine when she walked from the porch to the red car and back. The court explained that the jury would have had to infer that her conduct constituted a drug deal despite evidence that the officer did not see the defendant lean over and bend into the window of the car as she did with the actual controlled buy, did not see her deliver anything to the passenger, and did not see her return to the porch with money. Additionally, the jury would have had to also infer that if it was in fact a drug deal, the type of drug was the same and the amount was at least just over two grams. Id. at 726. While this series of inferences could create the possibility that the defendant had an agreement with the target to distribute more than five grams of crack cocaine, it did not establish proof beyond a reasonable doubt. Id.

In United State v. Hickman, the Fourth Circuit addressed whether the evidence was

25 - OPINION & ORDER

sufficient to allow the jury to conclude that the defendant agreed to distribute one kilogram of

cocaine where the direct evidence established the distribution of only 683 grams, and possibly

836 grams if one additional transaction which was discussed but had not occurred at the time of

arrest was included.  626 F.3d 756, 765-66 (4th Cir. 2010).  The evidence showed only one

actual transaction by the defendant, which was for 153 grams, as well as another 504 grams

found upon the search of a co-defendant's home.[7]  Upon the defendant's post-arrest release from

jail, he contacted a co-defendant to set up a deal to "do the same thing again."  The court allowed

that the only reasonable non-speculative inference from this discussion was that the defendant

intended to buy another 153 grams, the amount that he had just purchased from that co-

defendant.

   The government argued that the jury could have reasonably concluded that the intended

scope of the conspiracy was the distribution of at least one kilogram of heroin because the

conspiracy was an "ongoing course of business" or an "ongoing thing," and that the transactions

presented were only "part of something larger[.]"  Id. at 768.  The appellate court suggested that

had "hypothesized future bad acts" been "captured by an agreement," and had there been

evidence to "guide the trier of fact in determining the outer scope of a conspiracy," the

Government may have succeeded in establishing that the conspiracy had agreed to distribute at

least one kilogram of heroin.  Id. at 768-69.  But, given the limited number of actual transactions

involved there was insufficient evidence to make anything but a speculative inference and

_____

   [7]  The weights are after adjustment for various purity levels as explained at trial.
Additionally, in reaching the 683 gram figure, the court included 23.75 grams for the amount the
defendant agreed to buy but failed to do so because he did not have enough cash, and an
additional 1.7 grams attributable to some vials of heroin found in the defendant's car upon arrest.

extrapolation that the charged quantity was the intended agreement of the conspiracy.  Id. at 769-70.  The "evidence of unknown transactions was meager and offered virtually no guide as to the amounts that may have been involved[.]"  Id. at 770.

In contrast to Dunmire and Hickman, the Government here established a history of multiple transactions between Defendant Equihua-Ramirez and both his supplier Defendant Guzman-Arias and his best customer Burns.  As discussed in detail above, the evidence established a pattern of conduct and frequency of both purchases and sales for somewhere between two and three months.  This evidence distinguishes this case from the one or two transactions at issue in Dunmire and Hickman and in contrast, offered the jury a reasonable "guide" as to the total amount that was involved in the conspiracy.  Based on the history of dealing from mid-March to early June 2012 with approximately 274 grams expressly conceded, plus reasonable inferences derived from the evidence establishing that in that short amount of time, a total of approximately 699-750 grams was distributed, and construing the evidence and inferences in the Government's favor, the jury could have made a reasonable, non-speculative inference that Defendants must have agreed to distribute as much heroin as they could and that the distribution would have continued in a similar fashion.

Unlike in Hickman, the "hypothesized future bad acts" in this case are attributable to an agreement which is inferred based on the history of transactions established by the record.  Unlike in Hickman, there were multiple purchases and multiple sales and thus, there were more than a "limited number of actual transactions."  Unlike in Dunmire, there was an established pattern of transactions among members of the conspiracy, including Defendants.  Furthermore, the jury heard testimony that Defendant Equihua-Ramirez had obtained his distribution network

27 - OPINION & ORDER

from "Carlos" who connected Defendant Equihua-Ramirez to Defendants Guzman-Arias and Navarrette-Aguilar, indicating that the sales he participated in were not the first sales by the conspiracy.  As a result, a rational jury could reasonably conclude beyond a reasonable doubt that there was an agreement to distribute at least one kilogram of heroin.

Defendant Guzman-Arias contends that the logical extension of the Government's argument would result in the establishment of the mandatory minimum drug quantities in every drug conspiracy case as long as there is no evidence that the conspiracy intended to stop dealing. I disagree.  Both Dunmire and Hickman instruct that simply because a distribution conspiracy is interrupted by an arrest does not by itself allow a factfinder to conclude beyond a reasonable doubt that the conspiracy agreed to distribute the charged quantity of drugs.  Rather, the record must establish some basis upon which the factfinder can find without speculation that the conspiracy agreed at the outset to distribute the requisite quantity.  As Dunmire and Hickman indicate, evidence of one or two transactions is not enough.  Other factual scenarios could also fail to provide sufficient evidence where, for example, the record showed a history of sales of such small quantities such as one to three grams that it would be unreasonable to conclude that the members of the conspiracy agreed to distribute a particular charged quantity.  Or, there could be evidence that the conspiracy had access to only a limited supply of less than the alleged amount such that a jury could not reasonably conclude that the conspiracy ever agreed to distribute the charged amount of drugs.  The point is that just because the evidence shows that the members of conspiracy intended to keep a distribution scheme going is not by itself sufficient evidence upon which the jury may infer an agreement to distribute a certain amount of illegal drugs.  As such, Defendant Guzman-Arias's argument is not well-founded.

28 - OPINION & ORDER

For the reasons explained above, I deny Defendant Guzman-Arias's motion for judgment of acquittal.   While the Government failed in its attempt to establish beyond a reasonable doubt that the actual quantity purchased or sold by the conspiracy was at least one kilogram, based on the history of multiple transactions and the conservative calculation of quantities involved in those transactions, the evidence was sufficient to allow a rational jury to reasonably conclude beyond a reasonable doubt that Defendants agreed to distribute at least one kilogram of heroin.

II.  Motion for New Trial

A.  Standards

Upon motion by the defendant, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  United States v. Moses, 496 F.3d 984, 987 (9th Cir. 2007).   The court has discretion in deciding whether to grant a motion for a new trial.  See United States v. Kellington, 217 F.3d 1084, 1097 (9th Cir.2000) (noting that the district court's power to grant a motion for new trial is broader than its power to grant a motion for judgment of acquittal).  "The court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." Id.

B.  Discussion

Defendant Guzman-Arias makes two arguments in support of his motion:  (1) the Government violated due process by presenting the jury with the perjured testimony of Burns; and (2) the Government misstated the law in closing argument in a manner that prejudiced Defendant Guzman-Arias.

/ / /

29 - OPINION & ORDER

1. Burns's Testimony

Defendant Guzman-Arias argues that Burns intentionally lied in testifying that he bought one to three pieces of heroin each week from Defendant Equihua-Ramirez and that Defendant Equihua-Ramirez was his only source of heroin. Defendant Guzman-Arias contends that the Government knowingly presented this perjured testimony to the jury.

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976). As to Burns's purchases from Defendant Equihua-Ramirez, Defendant Guzman-Arias contends that once the phone records were available, Officer Manzella should have more closely analyzed the actual call history, or least asked Partridge or Federal Bureau of Investigation Agent Jennifer Banks who testified about other phone records at trial, to do so. He suggests that because the phone records "flatly contradict" Burns's testimony regarding the frequency and amount of purchases, the failure to more fully investigate and analyze the phone records resulted in the presentation of perjured testimony which fundamentally affected the outcome of the case.

I disagree. I have already explained above that the phone records actually support Burns's testimony regarding the frequency of his contacts with Defendant Equihua-Ramirez. Moreover, further analysis of those records would have been futile in the context of determining quantity because nothing in the phone records is relevant to that issue. The phone records create no inference that Burns lied about the frequency of his transactions with Defendant Equihua-Ramirez or the amount he purchased.

As to Burns's sources, the thrust of Defendant Guzman-Arias's argument as I understand

30 - OPINION & ORDER

it is that given that Burns was a long time heroin dealer with two prior convictions for heroin delivery, and given his general reluctance to cooperate with the police in this investigation, it was unreasonable for Officer Manzella to take Burns at his word that Defendant Equihua-Ramirez was Burns's only source of supply during the relevant time.  Burns testified that in the few months he had been purchasing heroin from Defendant Equihua-Ramirez, he had no other source for the heroin he distributed.  Tr. 10, 12, 16, 42.[8]  He explained that his previous source had stopped answering the phone and "it's just good to have a second source."  Tr. 11.  Sometimes, Burns explained, dealers have several sources of heroin at a time, but sometimes only one.  Tr. 43.  He acknowledged that he supplied heroin to other customers and that his phone contained extensive drug contacts.  Tr. 13.  Defendant Guzman-Arias argues that the police should not have taken Burns at his word and that the failure to further investigate the possibility of other sources or some other motive to implicate Defendant Equihua-Ramirez resulted in the Government knowingly presenting false testimony regarding Burns's suppliers.

Defendant Guzman-Arias's argument is essentially that Burns was unbelievable.  That a witness may not be credible, or credible on every issue, does not establish that the witness committed perjury and even more, does not establish that the prosecution knowingly put on the false testimony.  Here, while Burns testified reluctantly, he did testify and established without question that Defendant Equihua-Ramirez regularly supplied him with heroin.  His testimony on direct and on cross-examination regarding his sources was consistent:  at the relevant time, Defendant Equihua-Ramirez was his only source.  Although Defendant Guzman-Arias relies heavily on the phone records, he was unable to point to phone contacts exposing a second

---

[8]  Ex. 1 to Hamilton Aug. 1, 2013 Decl.

31 - OPINION & ORDER

supplier.

Additionally, Officer Manzella testified that information given to him by Burns was confirmed by some text messages, Burns's ability to place an order for more heroin from Defendant Equihua-Ramirez, and that Burns recalled the last place he purchased heroin from Defendant Equihua-Ramirez (which was also confirmed independently by Defendant Equihua-Ramirez).  Officer Manzella also noted that while heroin dealers like Burns often have more than one supplier, Burns had described Defendant Equihua-Ramirez as a fantastic or awesome source, implying that the one source would be enough.

On cross-examination, Defendant Guzman-Arias questioned Officer Manzella about the investigation, the pace at which it moved, whether Officer Manzella found Burns's criminal history relevant to determining the truthfulness of the information he provided, and whether Officer Manzella himself analyzed the phone records of calls between Burns and Defendant Equihua-Ramirez.  Officer Manzella stated that Burns characterized Defendant Equihua-Ramirez as his main supplier, conceding that such characterization could show that Burns may have had other suppliers.  Defendant Guzman-Arias raised the possibility in his cross-examination with Officer Manzella that Burns may have had a supplier who was a good friend that Burns wanted to protect by "giving up" Defendant Equihua-Ramirez.  Tr. 79.[9]

This is not a case where evidence at trial contradicted the witness's testimony to such a degree to raise an inference that the witness was intentionally lying.  This is not a case where post-trial evidence establishes that a witness intentionally gave false testimony.  Rather, this is a case where some of the witness's testimony seems unbelievable because of who the witness is or

---

[9]  Ex. 3b to Hamilton Aug. 1, 2013 Decl.

32 - OPINION & ORDER

what he has done.  Additionally, while Defendant Guzman-Arias contends that Officer

Manzella's investigation was not thorough, Defendant Guzman-Arias fails to show that any

additional investigation would have established that Burns had more than one source of heroin.

Defendant Guzman-Arias adequately raised issues regarding the extent of the investigation with

Officer Manzella on cross-examination, allowing the jury to fully assess Burns's credibility.

Nothing about the investigation raises a concern that the Government purposefully failed to

explore Burns's credibility further or knowingly presented false testimony.  Without more,

Defendant Guzman-Arias does not demonstrate that the Government intentionally presented the

jury with perjured testimony.  Finally, even if the investigation were inadequate in some way,

there is a huge difference between failing to adequately investigate a case or a witness's

testimony and knowingly putting on false testimony.  Defendant Guzman-Arias presents no

evidence whatsoever that the Government acted intentionally.

   2.  Government's Closing Argument

   Defendant Guzman-Arias contends that the Government misstated the law in closing

argument when it told the jury that it could base its determination that the conspiracy involved

one kilogram of heroin by concluding that the conspiracy would have distributed that amount

absent the arrests.  Defendant Guzman-Arias argues that this allowed the jury to reach the one

kilogram amount based on speculation.

   In its closing argument, the Government contended that the evidence showed an

agreement to distribute heroin and further "showed several hundred grams being sold by these

individuals." Tr. 59.[10]  The Government noted that there was no indication that the Defendants

---

[10]  Ex. 4 to Hamilton Aug. 1, 2013 Decl.

33 - OPINION & ORDER

intended to stop their distribution.  The Government argued that the machinery of the conspiracy,

"this agreement," was put into place and that the kilogram was probably only a fraction of the

ultimate quantity that was distributed.  The Government contended that this conclusion was

warranted based on the actual contraband seized together with the testimony from Defendant

Equihua-Ramirez.  Tr. 59-60.   In its rebuttal closing, the Government acknowledged Defendants'

argument that it was unreasonable for the jury to conclude that this conspiracy, "encompassed by

historical conduct and future conduct," "would constitute the distribution of a thousand grams of

heroin or more."  Tr. 63.  The government countered by arguing that it was in fact reasonable to

"infer what the operation is about by what is going on, by what they're selling."  Tr. 64.

      As discussed in the previous section discussing the motion for judgment of acquittal, the

Government's argument was that based on the historical conduct as evidenced by the record, the

jury was entitled to infer that Defendants had an agreement to distribute at least one kilogram of

heroin and that but for their arrests, they would have actually distributed that amount.  As

explained in the previous section, this is not a misstatement of the law given the facts of this

case.  Accordingly, I deny the motion for new trial on this basis.

      IT IS SO ORDERED.

Dated this _____ 7 _____ day of _____ Aug _____, 2013

Marco A. Hernandez
United States District Judge

34 - OPINION & ORDER